STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael J. FORSTER, Defendant-Appellant.†

Court of Appeals

*No. 02–0602–CR. Submitted on briefs November 27, 2002.—
Decided January 8, 2003.*

2003 WI App 29

(Also reported in 659 N.W.2d 144.)

† Petition to review denied 3-13-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins*, assistant state public defender, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sandra L. Nowack*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Michael J. Forster appeals from a judgment of conviction for second-degree sexual assault of a child contrary to WIS. STAT. § 948.02(2) (1999–2000).[1] He argues that, as a matter of law, the touching of a fifteen-year-old boy's chest does not constitute "sexual contact" within the meaning of § 948.02(2) because a boy's chest is not intended to be one of the "intimate parts" defined in WIS. STAT. § 939.22(19).[2] In addition, Forster appeals an order denying a postconviction motion to vacate his convic-

---

[1] WISCONSIN STAT. § 948.02 covers sexual assault of a child and provides in relevant part:

> **(2)** SECOND DEGREE SEXUAL ASSAULT. Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 16 years is guilty of a Class BC felony.

All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[2] WISCONSIN STAT. § 939.22 is Wisconsin's Criminal Code definitional section; it provides in relevant part:

> **(19)** "Intimate parts" means the breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound of a human being.

> . . . .

> **(34)** "Sexual contact" means the intentional touching of the clothed or unclothed intimate parts of another person with any part of the body clothed or unclothed or with any object or device, the intentional touching of any part of the body clothed or unclothed of another person with the intimate parts of the body clothed or unclothed, or the intentional penile ejaculation of ejaculate or intentional emission of urine or feces upon any part of the body clothed or unclothed of another person, if that intentional

tion. He contends that the evidence adduced at trial was insufficient to support the jury's verdict of sexual assault of a child. We disagree with both of Forster's contentions. The judgment and order of the trial court are affirmed.

¶ 2. An appellate court views facts in the light most favorable to sustain the verdict and where more than one inference might be drawn from the evidence presented at trial, we are bound to accept the inference drawn by the jury. *Burch v. Am. Family Mut. Ins. Co.*, 198 Wis. 2d 465, 474, 543 N.W.2d 277 (1996). Thus, we will relate the facts in a light most favorable to the jury verdict. *See State v. Bauer*, 2000 WI App 206, ¶ 3, 238 Wis. 2d 687, 617 N.W.2d 902.

¶ 3. In October 1999, the State filed a criminal complaint alleging that Forster had sexual contact with Grant F., a child under the age of sixteen, constituting second-degree sexual assault of a child contrary to Wis. Stat. § 948.02(2). A jury trial followed. Forster testified that he was the director of the Late Night Adventures summer camp in 1998, a faith-based camp for teens. Fifteen-year-old Grant met Forster in the summer of 1998 when he attended a week-long LNA camp session. After Grant returned home from camp, Grant's mother, Dana, noticed an improvement in his attitude. In the months after camp had ended, Forster sent Dana and Grant, along with other former campers, newsletters and e-mails relaying news about campers and upcoming camp-related events. One of these events was a one-night camp reunion in the winter of 1999, which Grant attended. Before the reunion, Dana noticed that

touching, ejaculation or emission is for the purpose of sexual humiliation, sexual degradation, sexual arousal or gratification.

Grant's attitude was deteriorating and that he was exhibiting a recurrence of the behavioral problems that had prompted the Waushara County Social Services Department to recommend that Grant attend camp in the first place. The one-night camp reunion did nothing to improve Grant's behavior and attitude.

¶ 4. On March 24, 1999, Dana sent an e-mail to Forster. The subject line of the e-mail stated: "A prayer wouldn't hurt." In her e-mail, Dana asked Forster to say a prayer for Grant because the improvements she had noticed when Grant returned home from the week of summer camp had not lasted long, and "[t]hings have not been going so well again."

¶ 5. In the evening on that same day, Forster phoned Dana and spoke with both her and Grant. Through Dana, Forster invited Grant to his home in New Berlin for the weekend. Dana and Grant testified that Forster told them that Grant's summer camp counselor and other summer campers would be coming for the weekend as well. Forster testified that he "had mentioned other campers" but that he did not tell Dana or Grant that other campers would be coming for the weekend too. Forster said that he only told Dana and Grant that he planned to phone Grant's counselor to see if maybe he could have dinner with him and Grant that weekend. Dana, Grant and Forster testified that Forster told them that he planned to hang pictures in his apartment over the weekend and Grant could come and help him. Dana and Grant accepted Forster's invitation. Forster's apartment in New Berlin was hours away from where Grant and Dana lived, so Dana and Forster agreed to meet in Fond du lac, a halfway point between their towns.

¶ 6. Two days later, Dana drove Grant to Fond du lac where Forster met them as planned. Grant then

rode with Forster to New Berlin for the weekend. Forster stated that after picking up Grant, he stopped at a Walgreen's en route to his apartment in order to pick up a disposable camera and a couple of Cokes. He explained his reason for purchasing a camera as follows:

> Um, I have four older sisters and my parents, and typically if someone moves or has just redecorated or whatever we'll take pictures, you know, of the walls or, you know of the outside or something and mail the pictures home . . . . And my regular camera was in for repair.

¶ 7. During the commute to New Berlin, Grant learned that he would be Forster's only guest that weekend. After stopping at Walgreen's, the two went to Menards and out to dinner. They arrived at Forster's apartment after 9:00 p.m. on Friday. Forster said that because it was after nine o'clock, they decided not to begin hanging pictures that night.

¶ 8. Grant and Forster spent most of Saturday hanging over fifty pictures on Forster's apartment walls. At some point during that day, Grant said that Forster asked him to remove his shirt and told him that he wanted to take "pictures with my shirt off doing muscular poses." Grant said that Forster told him that "he needed the pictures for a college class or something." Grant said that he did as Forster asked and that, at the time, he did not think it was weird. Forster admitted taking photos of Grant with his shirt off but stated that he did not ask Grant to remove his shirt. Forster claimed that he had been taking pictures of the pictures and "just decided to use up the rest of the roll of the film . . . and I knew from camp that, you know, jokingly [Grant] was what we would call kind of a poser, you know."

¶ 9. Saturday evening Forster and Grant ordered pizza and watched television. Grant testified that they watched the Dukes of Hazard, but that before the Dukes of Hazard, Forster was flipping through the channels and stopped at a "skin show" that was on Cinemax. Grant said that Forster left the skin show on for about fifteen to twenty minutes. Grant said that when they began to watch the skin show and then the Dukes of Hazard, he was seated on a couch and Forster was seated on a love seat. Grant said that at some point the seating arrangement changed when Forster moved from the love seat and sat next to Grant on the couch. Grant's testimony further related the following:

[State] What happened?

[Grant] He [Forster] had put his hand up my shirt and was rubbing my nipples and stomach.

[State] . . . How was he able to do that?

[Grant] Well, he did move over to the middle cushion completely.

. . . .

[State] Okay. Do you remember which hand he used to touch you?

[Grant] His right.

[State] What—How did you feel when you first noticed that his right hand was touching you?

[Grant] I really—didn't really care.

[State] Okay. When his hand first touched you, what part of your body did his hand come into contact with?

[Grant] My stomach.

156

[State] Okay. Did he say anything?

[Grant] Yes. He said, "You're really warm."

. . . .

[State] Did he move his hand from—Well, was his hand over your T-shirt or under your T-shirt?

[Grant] At first it was over.

[State] Okay.

[Grant] And then he had moved it under my shirt.

[State] Okay. So when in relation to when it was over your shirt and then under your shirt did he say, "You're really warm"?

[Grant] He had said it before and during.

[State] Okay. Did his hand stay on your stomach?

[Grant] No, it had moved around.

[State] Okay. Where did—Where is the first place you remember other than your stomach where his hand moved to?

[Grant] It came up to my left nipple.

[State] Okay. And what are you thinking then?

[Grant] I wasn't really thinking much at all.

[State] Okay. Did he do anything when his hand was in contact with your left nipple?

. . . .

[Grant] Yeah, he did. Had started kissing me on the neck.

157

[State] Okay. Was he doing anything else with his hand, or was his hand just kind of sitting there?

[Grant] He was rubbing it.

[State] Can you—Can you describe how he was rubbing it?

[Grant] Just in a circular motion.

[State] Okay.

[Grant] Around it.

[State] You said he was kissing you on the neck?

[Grant] Yes.

[State] Okay. So what are you thinking now?

[Grant] I wasn't really thinking much at all.

[State] Okay. How long—How long did that happen?

[Grant] Quite a while.

[State] Did he touch you anywhere else on your body?

[Grant] Yeah. He had moved over to my other nipple.

[State] With the same hand?

[Grant] Yes.

[State] What was he doing there?

[Grant] Same thing as the other nipple.

[State] Is he still kind of kissing you then?

[Grant] Ah, yes.

[State] Did he stop kissing you at any time during when this was going on?

158

[Grant] I don't think so.

[State] Okay. Did he say anything?

[Grant] I don't think so.

. . . .

[State] How come you didn't move away from him?

[Grant] There was nowhere to really move to.

[State] How long did this go on do you think?

[Grant] Twenty five minutes maybe.

. . . .

[State] Um, did you try and fidget or move to try and stop him from touching you this way?

[Grant] No.

[State] Okay. What were you thinking?

[Grant] I was thinking that he is much bigger than I am.

[Grant] Okay.

[State] What about how did you feel about him touching you the way he was touching you? Did you want him to do that?

[Grant] No.

[State] Do you remember what you were thinking while this was going on?

[Grant] Not exactly.

[State] Okay. Did you think about trying to move away from him at all?

159

[Grant] I thought about getting up and going to the bathroom.

[State] Okay. But you didn't?

[Grant] No.

[State] Why not?

[Grant] I was kind of frozen.

¶ 10. The next day, Forster gave Grant a ride to Fond du lac where Dana had agreed to meet them. Grant testified that as Forster drove, he placed his right hand on Grant's left leg, where it remained during most of the drive. Grant said that Forster first placed his hand on Grant's knee, but then gradually moved it toward Grant's crotch. Grant said that Forster suggested to Grant that he put his hand on top of Forster's to warm Forster's hand.

¶ 11. Dana testified that when Grant exited Forster's car the day she picked him up, she asked Grant how it was and the only thing she remembered him doing in response was "holding his head really low." Dana thought this was odd because Grant "always has something to say." Eventually, Grant told Dana what happened during the weekend he had stayed with Forster. Dana then met with a detective from the New Berlin police department, prompting the investigation that led to Forster's sexual assault conviction.

¶ 12. We will reverse a conviction based on insufficient evidence only if, as a matter of law, the probative value and force of the evidence presented is such that no trier of fact acting reasonably could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). However, questions

of statutory interpretation, such as the meaning of "intimate parts" within WIS. STAT. ch. 939, are questions of law that we review de novo. *See State v. Pablo R.*, 2000 WI App 242, ¶ 7, 239 Wis. 2d 479, 620 N.W.2d 423. When we interpret a statute, our goal is to ascertain and give effect to the intent of the legislature. *Id.* at ¶ 7. We first look to the language of the statute itself. *Id.* If the language of the statute is unambiguous in its meaning, we go no further. *Id.* A cardinal rule of statutory construction is that statutes must be construed to avoid an absurd or unreasonable result. *State v. Mendoza*, 96 Wis. 2d 106, 115, 291 N.W.2d 478 (1980). We will not find a statute ambiguous simply because the parties differ as to its meaning. *State ex rel. Girouard v. Circuit Court for Jackson County*, 155 Wis. 2d 148, 154–55, 454 N.W.2d 792 (1990). "The plain meaning of a statute takes precedence over all extrinsic sources and rules of construction." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 282 n.2, 548 N.W.2d 57 (1996).

¶ 13. Both parties agree that the issue presented in this appeal is whether WIS. STAT. § 939.22(19), which designates the "breast . . . of a human being" as an intimate part, includes the chest/breast of a male. Forster argues that the ordinary meaning of the term "breast" refers only to a female breast, and does not include parts of the male anatomy. He contends that the legislature did not intend the term "intimate parts" in the Criminal Code to include the male breast. To support this argument, he asserts that "[i]t is the female breast which has sexual connotations, not the male chest." In addition, he argues that if the term "breast" refers to a part of the male anatomy, there is an "anomaly in the statute" because male breasts may be

exposed in public, while other intimate parts identified in the statute may not. We disagree with each of these contentions.

¶ 14. When faced with plain language, as we are here, we apply the plain language unless such application would lead to absurd or unreasonable results. *Gasper v. Parbs*, 2001 WI App 259, ¶ 8, 249 Wis. 2d 106, 637 N.W.2d 399. WISCONSIN STAT. § 939.22(19) states: " 'Intimate parts' means the breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound *of a human being*." (Emphasis added.) Forster asks us to read the word "female" into the language of the statute, to qualify the term "breast." However, we will not read words into a statute if the statute has clear meaning on its face. *See State v. Hall*, 207 Wis. 2d 54, 82, 557 N.W.2d 778 (1997).

¶ 15. WISCONSIN STAT. § 939.22(19), on its face, makes no distinction between the male and female breast. We believe that the legislature's decision not to specify a particular sex when designating one of the "intimate parts" as "the breast . . . of a human being" was made intentionally to convey that the breast of *any* human being—male or female—is an intimate part under § 939.22(19). This is not ambiguous.

¶ 16. Moreover, the State aptly points out that the legislature specified "female" breast in other related statutes. For example, WIS. STAT. § 948.50, which pertains to strip searches by school employees, states:

> a search in which a person's genitals, pubic area, buttock or anus, or a *female person's breast*, is uncovered and either is exposed to view or is touched by a person conducting the search. (Emphasis added.)

The legislature similarly distinguished between male

162

and female breasts in WIS. STAT. § 948.11—which covers rules against exposing a child to harmful material or harmful descriptions or narrations. Here it states in para. (1)d:

> "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the *female breast* with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. (Emphasis added.)

Also, WIS. STAT. § 942.08, which addresses invasion of privacy, provides in para. (1)(a):

> "Nude or partially nude person" means any human being who has less than fully and opaquely covered genitals, pubic area or buttocks, *any female human being who has less than a fully opaque covering over any portion of a breast below the top of the nipple,* or any male human being with covered genitals in a discernibly turgid state. (Emphasis added.)

¶ 17. These examples further support the legislative intent that the breast referred to in WIS. STAT. § 939.22(19) means any male or female breast. If the legislature thought that only females had breasts, its gender-specific qualification of the breast in WIS. STAT. §§ 948.50, 948.11 and 942.08 would have been unnecessary. The choice of using the word "female" in these statutes implies an intent to make the statute applicable to the female breast and not to the male breast. Similarly, the choice *not* to use a gender qualification in § 939.22(19) implies the intent that the breast referred to is that of any human being—just as the statute plainly states: " 'Intimate parts' means the *breast,*

buttock, anus, groin, scrotum, penis, vagina or pubic mound *of a human being.*" (Emphasis added.)

¶ 18. We are satisfied that the plain language of WIS. STAT. § 939.22(19) is meant to include a female *and* a male breast because each is "the breast . . . of a human being" and thereby the touching of a boy's breast constitutes "sexual contact" within the meaning of WIS. STAT. § 948.02(2).

¶ 19. This decided, we can easily dispose of Forster's sufficiency of the evidence argument because he relies on his contention that a boy's breast is not an intimate part to support his ultimate conclusion that the evidence was insufficient to justify his conviction. We have established that the male breast is an intimate part as defined in WIS. STAT. § 939.22(19). Therefore, the only sufficiency of the evidence argument that could be asserted is that the evidence did not support that Forster intentionally touched this intimate part of Grant for the purpose of sexual humiliation, sexual degradation, sexual arousal or gratification. *See* WIS. STAT. §§ 939.22(34) and 948.02(2).

¶ 20. Once again we emphasize our standard of review: we will not overturn a jury's verdict on a sufficiency of the evidence claim unless, "the evidence is so insufficient in force and probative value that no reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *State v. Bodoh*, 226 Wis. 2d 718, 727, 595 N.W.2d 330 (1999). Grant testified that Forster slipped his hand under Grant's shirt and rubbed his nipple in a circular motion, while kissing Grant's neck, for approximately twenty-five minutes. We cannot say that this evidence is so insufficient in force and probative value that no reasonable jury could

have found Forster guilty of second-degree sexual assault of a child contrary to Wɪꜱ. Sᴛᴀᴛ. § 948.02(2).

*By the Court.*—Judgment and order affirmed.